UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| CHARLENE TALARICO, | 18 Civ. 00909 (JPO) |
| Plaintiffs, | |
| –against– | **PLAINTIFF'S RULE 56.1** <br> **COUNTERSTATEMENT** |
| PORT AUTHORITY OF NEW YORK and NEW JERSEY, | |
| Defendant. | |

-----------------------------------------------------------------X

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, Plaintiffs submit the below Counterstatement of Material Facts:

## **Procedural Posture and Parties**

1. Plaintiff Charlene Talarico ("Plaintiff") served a Notice of Claim on the Port Authority on November 30, 2017. See Declaration of Sandy Milord, Esq., dated May 3, 2021 Milord Declaration ("Milord Dec")., Ex. A.

Response:
Admitted.

2. On February 1, 2018, Plaintiff filed a Complaint in the Southern District of New York against the Port Authority. See Milord Dec., Ex. B.

Response:
Admitted.

3. Plaintiff's Complaint alleges Defendant violated 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and the Constitution of the State of New York. See Milord Dec., Ex. B.

Response:
Admitted.

    4. Defendants filed an Answer to the Complaint on February 26, 2019 denying the salient allegations. See Milord Dec., Ex. C.

Response:

Admitted. In addition on March 27, 2018 Defendant filed a motion to dismiss (partial). See Docket Entry 15. The motion was granted in part, as to all state law and punitive damage claims, and denied all other respects. See Docket Entry 31.

    5. At all times relevant hereto, the Port Authority was and is a body corporate and politic, created by Compact between the states of New York and New Jersey and recognized and endorsed by the Congress of the United States. See 1921 N.Y. Laws, Ch. 154; 1921 N.J. Laws, Ch. 151; 42 State 174; N.Y. McK. Unconsol. L., §§6404, 6631; Ex. B (PA Answer), ¶5.

Response:
Admitted.

## Incident

    6. Plaintiff worked as a senior administrative secretary within the Port Authority Technical Center within the Chief Security Office. See Milord Dec., Ex. D, p. 8:2-10.

Response:
Admitted.

    7. In 2011, Plaintiff worked for the Port Authority's Tunnels, Bridges and Terminals Department at the Lincoln Tunnel. See Milord Dec., Ex. D, p. 20:1-19.

Response:
Admitted.

    8. In June of 2016, Plaintiff claims she was forced out of work by various Port Authority employees. See Milord Dec., Ex. D., p. 13:3-21.

Response:

Admitted. Plaintiff specifically testified, "… they forced me out by putting me out sick and telling me I needed to go see a psychiatrist before I was allowed back." Talarico Dep. 14:7-14:9

9. Plaintiff claims to have written a letter to superiors about her experience. See Milord Dec., Ex. D., p. 22:1-20.

Response:

What Plaintiff actually testified to, concerning letter(s), in the portion of her Deposition cited by Plaintiff was that, "Well, steven Palatano was not happy that I sent a letter to Patrick Floyd, so Steven Palatano had myself and Donna Leborn in a room, in a meeting Steven Palatano proceeded to pull his chair within a millimeter of my nose and point his finger at my face and told me if I don't go along with his program he's calling HR and I'm out of here, which to me is threating my job. Tal. Dep. 22:13-22:20.

10. Plaintiff claims that following these complaints she was sent to the Port Authority's Office of Medical Services ("OMS") at the Journal Square Transportation Center to meet with a Port Authority psychologist. See Milord Dec., Ex. D., p. 23:4-24.

Response:
Admitted.

11. Thereafter, Plaintiff was sent to OMS offices two additional times to meet with Port Authority psychologists. See Milord Dec., Ex. D., p. 24:5-25.

Response:
Admitted.

12. Plaintiff had complaints about the rearrangement of her workspace cubicle which Plaintiff alleged was a source of anxiety. See Milord Dec., Ex. D., p. 28:4-9.

Response:

Admitted.

        13.    Plaintiff returned to work on August 3, 2016 and met with supervisors in order to be cleared to work on August 4, 2016. See Milord Dec., Ex. D., p. 32:3-9.

Response:

Plaintiff's actual testimony indicated that on August 3, 2016 she was cleared by a Port Authority psychologist to return to work on August 4, 2016 and that she returned to work on August 4, 2016. Tal. Dep. 32:3-32:13

        14.    During the meeting, Plaintiff alleges a disagreement ensued wherein her cellphone was removed from Plaintiff's hand See Milord Dec., Ex. D., p.39:1-25.

Response:

Plaintiff's cellphone was not just removed, there was an altercation between Diannae Ehler, the Director, Tunnels, Bridges and Terminals at Port Authority of New York and New Jersey, and Ms. Talarico which resulted in injury to herself and that precipitated the visit to the Office of Medical Services at 233 Park Avenue South, where her medical examination was clandestinely recorded on video. Complaint ¶ 3, Tal. Dep, 51:14-51:20.

        15.    Plaintiff attempted to bring criminal charges against one of the supervisors for assault for taking her cellphone during her August 3, 2016 meeting. See Milord Dec., Ex. D., p. 40:10-17. This case was later dismissed by the Union City Municipal Court in Weehawken, New Jersey, Hudson County on April 9, 2018, following a bench trial. See State v. Dianne Ehler, Docket No. S-2016-000352.

Response:

Admitted, inasmuch as Paragraph 15 refers to the meeting which took place on August 4, 2016. See Plaintiff's Response to Paragraph 13.

4

16. Thereafter, Plaintiff went to the Port Authority Police Department to complain about injuries to her hand and indicated she wanted to go to OMS. See Milord Dec., Ex. D., p. 39:20-43:6.

Response:

This misconstrues Plaintiff's testimony. Plaintiff complained to the PAPD about injuries to her hand almost immediately after they occurred, thereafter her intent was to go to a PA OMS facility called PATC the same day she was injured, when she was ordered by the PA to go to the PA facility located at 233 Park Avenue South, the same day she was injured. Tal Dep. 39?20-43:6.

17. On August 3, 2016, Plaintiff went to the Port Authority's OMS located at 233 Park Avenue South, New York, New York, where she met with Port Authority medical staff. See Milord Dec., Ex. D., p. 48:14-15.

Response:

Admitted, inasmuch as Paragraph 17 refers to the OMS visit that took place on August 4, 2016. See Plaintiff's Response to Paragraphs 13 and 16.

18. Plaintiff spoke with Dr. Pascale Kerlegrand ("Dr. Kerlegrand") and alleged that her left hand was injured as a result of the incident. See Milord Dec., Ex. D., p. 49:1-6.

Response:

Plaintiff didn't just allege that she had an injury to her left hand. See supra. At the end of this examination Dr. Kerlegrand decided to keep Plaintiff out of work and to refer her to a hand surgeon for evaluation. See Kerl. Dep., 18:16-19:12

19. The curtains within the room where Plaintiff's hand was observed were not closed and another nurse was present in that space. See Milord Dec., Ex. D., p. 52:1-8; 53:3-10.

Response:

There is an issue of material fact as to whether the Plaintiff had a reasonable expectation of privacy in the medical examination she received at 233 park Avenue South on August 4, 2016. The video of the examination itself, Declaration of Sandy Milord ("Milord Dec.), dated May 3, 2021, Exhibit G, shows that this room was much smaller than an emergency room in a typical municipal hospital and had limited capacity for examinations. Dr. Kerlegrand testified that the video surveillance camera was located right above the double doors that led into the examination room. Kerl. Dep., 24:23-25:3, 31:7-31:17. Hence the video shows a space where only a limited number of examinations can be carried out at any one time. Milord Dec., Exhibit G. Dr. Kerlegrand's testimony that this limited examination space was partitioned away from the general waiting area, also shows that it was not generally open to the public or other patients. Kerl. Dep., 24:23-25:3, 31:7-31:17. The video itself shows that Ms. Talarico was the only person being examined during the course of the video. Milord Dec., Exhibit G. The examination room also contained the nurse supervisor's desk and the purpose of the curtain in the examination room was to separate the nurse supervisor's desk from the rest of the room. See Kerl. Dep., 38:22-39:5. The video clearly shows that the curtain was drawn in a fashion that blocked off one section from another. Milord Dec., Exhibit G. It is undisputed that the surveillance was carried out without the knowledge of Dr. Kerlegrand, the nurses who regularly used the examination room, Ms. Talarico, and patients in general. See Kerl. Dep., 20:18-21:07, 38:10-39:5. Indeed, the camera was installed in such a way that it was not readily detectable to the untrained eye. See Kerl. Dep. 24:2-25:3. When Dr. Kerlegrand learned that she had been videotaped along with Ms. Talarico [and the two nurses referred to above] she, among other things, indicated she felt extreme shock, distress, and outrage. Kerl. Dep., 21:21-22:8, 26:16-27:13

20. Two nurses entered and exited the area where Plaintiff's hand was being looked at by Dr. Kerlegrand. See Milord Dec., Ex. D., p. 54:1-3; p. 62:4-20..

Response:
See Plaintiff's Response to Paragraph 19.

21. Part of the room was the nurse supervisor's office. See Milord Dec., Ex. E., p. 38:5- 25.

Response:
See Plaintiff's Response to Paragraph 19.

22. Dr. Kerlegrand examined Plaintiff's hand. See Milord Dec., Ex. E., p. 14:-2-6..

Response:
Admitted. See also Plaintiff's Response to Paragraph 18.

23. Plaintiff was fully clothed during the brief examination of Plaintiff's hand. See Milord Dec., Ex. D., p. 55:25; 56:1-5.

Response:
See Plaintiff's Response to Paragraph 19.

24. Plaintiff claims she did not see any cameras or recording devices within the room. See Milord Dec., Ex. D., p. 56:6-9.

Response:
Admitted. Moreover, it is undisputed that the surveillance was carried out without the knowledge of Dr. Kerlegrand, the nurses who regularly used the examination room, Ms. Talarico, and patients in general. See Kerl. Dep., 20:18-21:07, 38:10-39:5. Indeed, the camera was installed in such a way that it was not readily detectable to the untrained eye. See Kerl. Dep. 24:2-25:3. When Dr. Kerlegrand learned that she had been videotaped along with Ms. Talarico [and the two

7

nurses referred to above] she, among other things, indicated she felt extreme shock, distress, and outrage. Kerl. Dep., 21:21-22:8, 26:16-27:13

 25. On the date of incident, August 4, 2016, Dr. Kerlegrand was unaware of any policies or procedures at the Port Authority concerning cameras or recording devices at OMS; was unaware of the use of a security camera at 233 Park Avenue South or that her looking at Plaintiff's hand was being recorded. See Milord Dec., Ex. E., p. 20:2-22.

Response:

Admitted.

 26. Plaintiff pursued a criminal case against one of her supervisors in New Jersey. See Milord Dec., Ex. D., p. 64:15-21.

Response:

Admitted.

 27. During discovery in the criminal case, Plaintiff learned about the video recording of her hand. See Milord Dec., Ex. D., p. 74:2-25; 75:1-21.

Response:

Admitted. She became aware in or around February 2017. Complaint ¶ 4

 28. Dr. Kerlegrand became aware of the video recording in March 2017. See Milord Dec., Ex. E., p. 21:3-7.

Response:

Admitted.

 29. Dr. Kerlegrand was informed that the subject camera was installed to ensure that no one was stealing medication from the medicine cabinet located on the wall in the room. See Milord Dec., Ex. E., p. 28:9-12.

Response:

Admitted. But by the time Ms. Talarico's medical examination was videotaped, medications were not being kept in the medical cabinet in view of the security camera. <u>See</u> Kerl. Dep., 27:14-29:03.

        30.    Moving forward Dr. Kerlegrand was informed that there were no more cameras in this area. See Milord Dec., Ex. E., p. 35:13-17; 37:13-16.

Response:

There is an issue of material fact as to if or when the surveillance camera was removed.

<u>Compare</u> "Well I remember at one point , I'm not sure during the time it was, Dr. Fischer did tell me that there are no video cameras that are in patient rooms," Kerl Dep. 37:13-16, with:

Q. Was the operation of that camera that OMS had requested to be installed at 233 Park Avenue South ever disabled before OMS moved out of Park Avenue South?

A. I'm sorry, before they moved out?

Q. Yeah, was it ever disabled?

A. Not to my knowledge.

Q. So it was in continuous operation then from the time that the request was made to install it to the time that OMS moved out?

A. I believe so, yes.

Panio Dep., 33:4-33:17.[1]

        31.    Dr. Kerlegrand testified at the criminal proceeding. See Milord Dec., Ex. E., p. 18:16-19:12.

Response:

Facts alleged by Paragraph 31 are not material to the motion.

---

[1] OMS left 233 Park Avenue South in or around Spring 2017.  Panio Dep., 28:4-28:11.

9

32. In 2016, Boss Systems was responsible for the installation of security systems at the Port Authority's space at 233 Park Avenue South. See Milord Dec., Ex. F., p. 14:10-14.

Response:

Admitted.

33. The only cameras fixed at Port Authority locations are security cameras, the purpose of which is to monitor access and egress from office spaces, elevators, lobbies, entrances to offices, exits and stairwells. See Milord Dec., Ex. F., p. 16:19-25; 17:1-6. There were no other cameras within the examination rooms/spaces of OMS, other than the camera at issue. See Milord Dec., Ex. F., p. 28:12-24.

Response:

There is an issue of material fact as to whether PA security cameras in general, and the camera that clandestinely captured the recording of Ms. Talarico's August 4, 2106 medical examination were operated pursuant to a practice that was the moving force behind deprivation of Plaintiff's Fourth and Fourteenth Amendment privacy interests. See Panio Dep., 12:13-13:9, 18:12-18:14, 20:18-23:23, 28:25-29:10, 29:24-28:11, 32:3-32:13, 32:14-32:22, 33:13-33:17, 40:3-40:7; Kerl. Dep., 20:18-21:07, 25:25:8-26:3, 26:04-26:15, 38:10-39:5, 27:14-29:03; Tal. Dep., 51:14-51:20; Soto Dec., Exhibit D, pp.8, 9. See also Plaintiff's Response to Paragraph 19.

34. Security camera footage is stored on localized recorders for 30 days of which the Security Equipment Contractor is responsible for the operation of those localized recorders. See Milord Dec., Ex. F., p. 18:8-19.

Response:

See Plaintiff's Response to Paragraph 33.

35. Sometimes footage is merely recorded, in other instances footage is recorded and monitored, such as entrances and exits. See Milord Dec., Ex. F., p. 19:2-18.

Response:

See Plaintiff's Response to Paragraph 33.

36. Footage is not subject to any facial recognition technology or any other technology. See Milord Dec., Ex. F., p. 20:2-10.

Response:

See Plaintiff's Response to Paragraph 33.

37. When videos are requested, they must be approved by the Inspector General. Thereafter, videos are provided to whomever the Inspector General directs that video be sent to. Even requests from law enforcement agencies are directed to the Inspector General for approval. See Milord Dec., Ex. F., p. 21:3-7; 23:17-23.

Response:

See Plaintiff's Response to Paragraphs 19 and 33.

38. OMS occupied this space at 233 Park Avenue South since 2002. The request from OMS to monitor the drug/medication cabinet in that room was to increase security on that cabinet. See Milord Dec., Ex. F., p. 32:3-22.

Response:

See Plaintiff's Response to Paragraphs 19 and 33.

39. The Operations Services Department maintains a log of every request made to review security camera footage and a search of that log revealed that – other than this one request Case 1:18-cv-00909-JPO-KHP Document 80 Filed 05/03/21 Page 5 of 6for Plaintiff's criminal case – there were no other requests made for footage from the camera at issue in this case during the period of 2002,

11

the date that the 233 Park Avenue South building went into use, through the date that the Port Authority's OMS vacated the premises. See Milord Dec., Ex. F., p. 41:8-25; 42:2-8.

Response:

See Plaintiff's Response to Paragraphs 19 and 33.

40. Thus, the only way to view any footage or obtain any information from the camera at issue was through a request made to the Operations Services Department either by Office of the Inspector General or approved by the Office of the Inspector General. See Milord Dec., Ex. F, p. 13:4-13; 21:3-7; 23:17-23.

Response:

See Plaintiff's Response to Paragraphs 19 and 33.

Dated: New York, New York
       May 17, 2021

                                      Respectfully submitted,
                                      ADVOCATES FOR JUSTICE
                                      CHARTERED ATTORNEYS
                                      *Attorneys for Plaintiff*

                                      By:       *Richard Soto*
                                               Richard Soto
                                        225 Broadway, Suite 1902
                                      New York, New York 10007
                                      Tel: 212-285-1400
                                      Fax: 718-228-5537